Anthony Rex Gabbert, Judge
James N. Rhymer appeals a judgment entered upon a jury verdict finding him guilty of second-degree murder pursuant to Section 565.021,[1] first-degree assault pursuant to Section 565.050, kidnapping pursuant to Section 565.110, and three counts of armed criminal action pursuant to Section 571.015. He asserts three[2] points on appeal. He contends that the circuit court, 1) erred in entering a judgment of conviction on Count V, kidnapping, as there was insufficient evidence he removed Corey Cornejo for the purpose of facilitating an assault, 2) erred in entering a judgment of conviction on Count VI, armed criminal action, as there was insufficient evidence he committed the underlying felony of kidnapping, and 3) plainly erred in erroneously instructing the jury regarding the kidnapping charge. We affirm in part and reverse in part.
Factual and Procedural Background
In the light most favorable to the verdicts, the evidence at trial showed that on November 28, 2014, Raymond Cornejo was at his girlfriend's home. James Rhymer pulled up in a four-door pickup truck and asked Raymond to go with him to see Raymond's brother, Corey Cornejo.[3] Raymond went with Rhymer to the hotel where Corey was staying. Rhymer asked Raymond to wait in the truck while Rhymer got Corey. Corey owed Rhymer $1500 for methamphetamine that he was supposed to sell but had used instead. Corey knew Rhymer had been looking for him; Rhymer made numerous calls to Corey's cell phone and left messages with Corey's brother and other individuals. Rhymer, Raymond, and Corey then went to David Mendez's house. Corey testified that he did not know what Rhymer wanted with Mendez. Rhymer asked Raymond to wait in the truck while they got Mendez. Rhymer *717 asked Corey to go to the door to get Mendez to come outside. Corey had known both Rhymer and Mendez for approximately fifteen years. Corey and Mendez were best friends. Corey testified that he did what Rhymer told him because Rhymer had a gun; Rhymer had shown Corey the gun and had pointed the gun at him.
Mendez was at the door when Corey reached it. They were told by Rhymer to go toward the basement. Mendez's bedroom was in the basement. When the three reached the basement, Kristy Robinson, Pebbles Harr, and a little girl were all present; Kristy Robinson was Mendez's niece and Pebbles Harr was Mendez's girlfriend. As the men entered the basement, Kristy was bent over a pile of laundry trying to find clothing. While searching, Kristy looked up and saw an unknown man (whom she later identified as Rhymer) standing in front of her. He ordered her to go to another room. Annoyed, Kristy ignored him and went back to looking for her clothing. Rhymer hit her in the back of the head with his gun and the gun fired. Kristy thought she had been shot; the back of her head was numb, felt like it was on fire, and she could feel blood. She immediately followed Rhymer's orders and went to the other room and laid on the bed. She saw Pebbles, Corey, and Mendez. Rhymer was waving the gun back and forth and demanding they sit down. According to Kristy, Rhymer was extremely angry, had the gun pointed, and was demanding, "I want my sh* *." It then became silent as they could hear someone descending the stairs.
After being woken by the gunshot, Ola Margaret Mendez, Mendez's mother (Kristy's grandmother) came down the stairs and demanded to know what the noise was. She was told it was a firecracker. Rhymer smirked at Ola Margaret, commenting about the firecracker. Ola Margaret asked him who he was and told him to leave. Rhymer just stood there. Ola Margaret told him she was calling the police. Rhymer said, "Come on," and Corey and Mendez followed him. Ola Margaret told Mendez not to go anywhere. He responded, "Oh, I got to go upstairs." Ola Margaret thought Mendez was going to let Rhymer and Corey out and lock the door.
After the men left, Kristy was crying and told Ola Margaret she had been shot. Ola Margaret ran upstairs to call the police. As soon as she got upstairs, Ola Margaret saw her eight-year-old great-granddaughter "standing there crying her eyes out." She told Ola Margaret, "Grandma, that guy had a gun in Uncle Cuko's[4] back and made him go out the door."
Corey was asked at trial if he was "leaving at gunpoint" when he exited Mendez's home. He testified that, although Rhymer's gun was not visible because he had put it in his hoodie, the threat was there. Corey, Rhymer, and Mendez got into Rhymer's truck after exiting the residence; Raymond was still waiting in the truck. Rhymer drove, Corey was next to him in the front passenger seat, Raymond was behind Rhymer in the back driver's-side seat, and Mendez was behind Corey in the back passenger-side seat. Corey testified that, as they drove away from the Brookside Avenue residence "we went down 24 Highway, we were en route to find some money that I owed [Rhymer] somewhere. He didn't care where it was, but we were going to find the money I owed him."
Soon thereafter, Rhymer asked Mendez if he had taken the keys to his truck. The two argued. When Rhymer reached a stop sign at 12th Street and Ewing, Rhymer pulled out a gun and pointed it at Mendez.
*718 Mendez pushed the gun away and told Rhymer not to point it at his face. Corey testified, "I remember [Rhymer] got pissed off because [Mendez's] hand hit the gun. He asked him to get it out of his face, [Mendez] hit the gun, and the altercation began." Rhymer began to climb from the front seat toward Mendez. The two continued to exchange words. Rhymer pointed the gun at Mendez again, and Mendez again pushed it away. Rhymer shot Mendez in the left thigh. Rhymer and Mendez struggled for the gun. Mendez was able to get the gun from Rhymer and screamed at Corey to take the gun. Corey had his back to the front dash of the truck as far as he could go and was yelling at his brother Raymond to get out of the truck. Raymond exited the truck.
Corey took the gun from Mendez. While taking the gun, he dropped the clip. Rhymer took the gun from Corey and shot Mendez in the head behind his left ear. The bullet exited Mendez's right ear. The bullet to Mendez's head killed Mendez immediately.
Mendez slumped forward. Rhymer suggested going "back to the house." Corey told Rhymer that they could not go back to the house - they needed to leave and "get rid of [Mendez]." Rhymer and Corey drove around for a while and ended up in Raytown off 350 Highway. Rhymer pulled into a gas station and Rhymer told Corey to go inside and purchase cigarettes and something to drink. Rhymer met Corey in the bathroom and told him to not touch anything, and if he already had to wipe it down. Rhymer put gas in the truck. He also filled a cup with gasoline and told Corey to pour the gasoline on Mendez. Corey complied. The two drove to Rhymer's apartment but parked the truck a couple of blocks away. Rhymer told Corey that they would clean out the truck and they did. Rhymer told Corey that they were going to his apartment; Corey was to get undressed, shower, and Rhymer would provide him a change of clothes.
Rhymer and Corey met up with Rhymer's roommate, Anthony McCubbins. Corey and McCubbins followed behind Rhymer's truck as Rhymer led them to a rural area on a gravel road. Rhymer drove off the gravel road. Corey could not see anything as it was dark and the truck lights were off. He could only hear movement in the grass. Rhymer got back in his truck and told Corey and McCubbins to follow him up the road. Rhymer's truck disappeared in the dark. Corey told McCubbins, "Don't go down there. Stay here. If we go down there, we're not coming out of there." Corey and McCubbins sat there idle for ten or fifteen minutes. Corey told McCubbins to leave and they started down the road leaving Rhymer behind. McCubbins then turned back telling Corey, "If I leave him, he'll kill me." Rhymer was waiting for them at the side of the road.
Rhymer, Corey, and McCubbins drove back to the city. While passing over a bridge, Rhymer told Corey to throw the clip of the gun into the river, and then throw the gun into the river. Corey complied. Rhymer was hungry so they stopped at Taco Bell. Corey told Rhymer he wanted to go home. Rhymer said, "All right. I'm going to let you go home."
Upon arriving home, Corey was told the police were looking for him. Corey walked outside to smoke a cigarette and Ola Margaret pulled up in a vehicle, frantically asking about her son. Corey was unable to tell her that Mendez was dead and told her he did not know where Mendez was. Corey had just shared Thanksgiving dinner with Ola Margaret and her family the previous day. Ola Margaret told Corey to get in her van because she was taking him to talk with detectives. Corey spoke with police *719 and told them Mendez was dead. He led police to all the locations he and Rhymer had been. Corey led police to a field in rural Cass County where Mendez's body was located, and led police to a field approximately two miles away where a burned-up vehicle was discovered. The vehicle was a four-door pickup truck that was completely burned leaving the make and model unidentifiable.
The State charged Rhymer with first-degree murder (for shooting and killing Mendez), first-degree assault (for striking Robinson with a handgun), kidnapping (for unlawfully removing Corey without his consent from a residence for the purpose of committing the felony of assault of David Mendez), and three counts of armed criminal action (for committing the other three counts with a dangerous instrument or deadly weapon). Rhymer was charged as and found to be a persistent offender, having been found guilty of resisting arrest in 2012, stealing a motor vehicle in 2006, and first-degree tampering in 2006. After a jury trial, Rhymer was found guilty of the lesser-included offense of second-degree murder and guilty as charged on all remaining counts. He received life sentences for the murder, assault, and kidnapping, and fifteen-year sentences for each of the armed criminal action convictions. All sentences were to run concurrently. This appeal follows.
Point I - Sufficiency of the Evidence for Kidnapping Conviction
In his first point on appeal, Rhymer contends that the circuit court erred in finding sufficient evidence to sustain the kidnapping conviction. He argues that the State failed to establish that he removed Corey from Mendez's home for the purpose of facilitating an assault.[5]
When examining a sufficiency challenge, we consider only the legal question of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Zetina-Torres , 482 S.W.3d 801, 809 (Mo. banc 2016) (internal quotation marks and citations omitted). Our review is based on how the crime was charged. Id. We accept as true all evidence and reasonable inferences that support the conviction, ignore all evidence and inferences to the contrary, and do not reweigh the evidence. State v. Gilmore , 537 S.W.3d 342, 344 (Mo. banc 2018).
Rhymer was charged with unlawfully removing "Corey Cornejo without his consent from 548 S. Brookside Avenue, Independence, MO, the place where he was found by the defendant, for the purpose of facilitating the commission of the felony of Assault of David Mendez." As relevant to the charge against Rhymer, a person commits the crime of kidnapping if he or she unlawfully removes another without his or her consent from the place where he or she is found for the purpose of facilitating the commission of any felony. § 565.110.
First degree assault and second degree assault, both felonies, are defined in Sections 565.050 and 565.060, respectively. A person commits the crime of first-degree assault "if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." § 565.050.1. As relevant here, a person commits the crime of second-degree assault if he or she:
*720 (1) Attempts to kill or knowingly causes or attempts to cause serious physical injury to another person under the influence of sudden passion arising out of adequate cause; or
(2) Attempts to cause or knowingly causes physical injury to another person by means of a deadly weapon or dangerous instrument; or
(3) Recklessly causes serious physical injury to another person; or
(4) Recklessly causes physical injury to another person by means of discharge of a firearm.
§ 565.060.
The evidence shows that Rhymer intended to recover money from Corey and truck keys from Mendez. After assaulting Robinson with his gun,[6] Rhymer pointed the gun at everyone demanding, "I want my sh* *." After Ola Margaret told him to leave, he did not leave alone but took Corey and Mendez with him at gunpoint. Corey testified that he owed Rhymer $1,500 for methamphetamine, and as they drove away from the Brookside Avenue residence, "we went down 24 Highway, we were en route to find some money that I owed [Rhymer] somewhere. He didn't care where it was, but we were going to find the money I owed him." Soon after leaving the residence, Rhymer pointed his loaded gun at Mendez and demanded information regarding his truck keys. When Mendez pushed the gun away, Rhymer shot Mendez in the leg. Mendez gained control over the gun and handed it to Corey, presumably believing it would be in safe hands. Corey testified: "Somehow [Mendez] got the gun from him, asked me - screaming at me to take the gun, take the gun.... I take the gun. In the midst of me taking the gun, I dropped the clip. And [Rhymer] takes the gun from me and he shot [Mendez]." Mendez was killed instantly. Corey advised Rhymer that they needed to leave and "get rid of [Mendez]." Corey assisted Rhymer in destroying evidence of Mendez's murder.
We find sufficient evidence to support that Rhymer used Mendez's best friend, Corey, to gain access to Mendez whom he intended to commit felony assault against. It can be reasonably inferred that, because Corey owed Rhymer money and feared Rhymer, Rhymer used Corey to assist with this assault. Having known Corey for fifteen years, Rhymer likely knew the influence he could wield over Corey. Rhymer removed both Corey and Mendez at gunpoint from the Brookside Avenue residence after discharging his firearm within the home and committing felony assault against Robinson. A reasonable juror could infer that Rhymer intended to continue this assaultive behavior when he removed Corey and Mendez from the residence. Soon after getting into the truck with Mendez, Rhymer committed felony assault against Mendez when he shot Mendez in the leg. Although Mendez gained control over the gun and handed it to Corey for safety, there is no evidence that Rhymer had to struggle with Corey to recover his gun. Corey merely testified, "And he takes the gun from me and he shot [Mendez]." Corey ensured his brother, however, had safely exited the vehicle prior to this. Although Corey had possession of the assault/murder weapon and yelled at Raymond to get out, Corey did not leave. It can be reasonably inferred from the evidence that Corey helped Rhymer facilitate felony assault against Mendez by gaining access to Mendez, allowing Rhymer to regain possession of the assault/murder weapon, and disposing of evidence after the assaults, and that Rhymer removed *721 Corey from the Brookside Avenue residence for that purpose.[7]
The circuit court did not err in finding sufficient evidence to sustain Rhymer's conviction of kidnapping pursuant to Section 565.110.
Point one is denied.
Point II - Sufficiency for Armed Criminal Action Conviction Related to Kidnapping
In his second point on appeal, Rhymer contends that the circuit court erred in entering a judgment of conviction on Count VI, armed criminal action, as there was insufficient evidence that Rhymer committed the underlying felony of kidnapping. As there was sufficient evidence to support the kidnapping conviction, this point fails.
Point two is denied.
Point III - Instructional Error, Kidnapping
In his third point on appeal, Rhymer contends that the circuit court plainly erred by erroneously instructing the jury regarding the kidnapping charge. Rhymer argues that because Instruction 17, the verdict director, did not require the jury to find Rhymer unlawfully removed Corey for the purpose of facilitating a felony , the error was prejudicial. Rhymer contends that the faulty instruction relieved the State of its burden to prove an essential element of the crime resulting in manifest injustice.
The State concedes Instruction 17 was erroneous but contends no plain error resulted because the verdict was not tainted by the error. The State argues that, because the jury found Rhymer engaged in felonious assaultive behavior when it convicted him of second degree murder for Mendez's death, it would have found the same if provided an accurate instruction.
"When reviewing claims of instructional error, this Court will reverse the circuit court's decision only if the instructional error misled the jury and, thereby, prejudiced the defendant." State v. Zetina-Torres , 482 S.W.3d 801, 810 (Mo. banc 2016). "Prejudice occurs when an erroneous instruction may have influenced the jury adversely." Id. "Reversal is only warranted when the instructional error is so prejudicial that it deprived the defendant of a fair trial." Id. (internal quotation marks and citation omitted). "In determining whether the jury instruction misdirected the jury, an appellate court will be more inclined to reverse judgments where the erroneous instruction 'did not merely allow a wrong word or some other ambiguity to exist, [but] excused the State from its burden of proof on [a] contested element of the crime.' " State v. Jones , 519 S.W.3d 818, 826 (Mo. App. 2017) (quoting State v. Doolittle , 896 S.W.2d 27, 30 (Mo. banc 1995) ).
*722 Rhymer failed to object to Instruction 17 and requests plain error review under Rule 30.20. "Instructional error rarely rises to the level of plain error." State v. Scott , 278 S.W.3d 208, 212 (Mo. App. 2009). For a defendant to establish plain error from an instructional error, he "must show more than mere prejudice and must show that the circuit court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict, and caused manifest injustice or miscarriage of justice." Id. (internal citation and quotation marks omitted). "A verdict directing instruction that omits an essential element rises to the level of plain error if the evidence establishing the omitted element was seriously disputed." State v. Cooper , 215 S.W.3d 123, 126 (Mo. banc 2007). That is because "[a] defendant's due process rights are violated when an instruction relieves the state of its burden to prove the existence of every essential element of the crime and does not require the jury to deliberate on and determine a contested element of the crime." State v. Stover , 388 S.W.3d 138, 154 (Mo. banc 2012).
Instruction 17 was patterned on MAI-CR3d 319.24 which, as relevant here, requires the jury to find the defendant guilty of kidnapping if the defendant's purpose in removing the victim was to facilitate the commission of a felony. The name of the felony is to be inserted into the instruction. Based on Rhymer's charges, the State was required to prove that Rhymer forcibly removed Corey for the purpose of facilitating felony assault. The jury was instructed to find Rhymer guilty of kidnapping if he removed Corey for the purpose of committing "assault," defined in the instruction as "purposely or knowingly placing or attempting to place another in far [sic] of physical harm." This definition, at most, describes misdemeanor assault. It is found in Section 455.010(1)(a) and is relevant to Chapter 455.010 to 455.085 governing domestic abuse and violations of orders of protection.[8] Felonious assault is defined in Sections 565.050 and 565.060, described above under Point I.
"The critical question is whether a reasonable likelihood exists that the jury understands the instruction to relieve the State of its burden of proof as to a statutory element." State v. Erwin , 848 S.W.2d 476, 483 (Mo. banc 1993). We find that Instruction 17 created this likelihood. The prosecution argued in closing:
He takes Corey Cornejo. Removed him without the consent of Corey Cornejo. Corey didn't want to go with him. And, finally, what's the purpose? He's taking him to - for an assault. He is going to get the money and the keys. The threat of the assault is the gun. He's put him in fear of apprehension of being injured. We know that because that's why he goes along with him.
Corey testified that Rhymer's actions caused him fear of physical harm; he feared for his life when Rhymer forced him in and out of the Brookside Avenue residence at gunpoint.
We disagree with the State's assertion that Rhymer's purpose for removing Corey was independent of any definition of assault provided in the instruction. The statute requires that removal of the victim must be with the "purpose of ... facilitating the commission of any felony...." Because Rhymer was charged with removing Corey for the purpose of assault, the State was required to prove *723 that Rhymer removed Corey with the intent to facilitate felony assault.[9]
We also disagree with the State's contention that there is no prejudice because the jury found Rhymer's behavior satisfied a felony definition of assault when it convicted him of second degree murder. While that may be true, that does not bear on whether the evidence established an intent to facilitate the commission of a felony at the time Corey was removed from the property . On this subject, though we have found in connection with our discussion of Rhymer's first point on appeal that there is sufficient evidence in the record to permit the reasonable inference that Rhymer removed Corey from the property with the intent to facilitate the commission of felony assault, that evidence permitting that inference was contested at trial. And in any event, the evidence of intent to facilitate the commission of a felony was not so overwhelming as to negate the likelihood that the jury was misled by Instruction 17 to believe that it only needed to find that Rhymer removed Corey from the property to facilitate scaring Corey or Mendez into producing his property, conduct that is not a felony.[10]
The State argued at trial that Rhymer deliberated on Mendez's murder and asked the jury to convict Rhymer of first degree murder; finding no deliberation, the jury convicted Rhymer of second degree murder. As related to the kidnapping charge, the second degree murder conviction shows that Rhymer could not have intended to kill Mendez at the time Rhymer forcibly removed Corey from the home. Rhymer knowingly killed Mendez, but we do not know when Rhymer developed the knowledge that his behavior would likely result in Mendez's death.[11]
The jury was not asked if Rhymer intended felony assault when removing Corey from the Brookside Avenue residence. Instruction 17, and the State's closing argument, led the jury to believe that misdemeanor assault (placing Corey or Mendez in fear of harm) was enough to support a guilty verdict for kidnapping. "Where a substantial issue exists regarding the defendant's state of mind, it is impossible to *724 say the error is harmless beyond a reasonable doubt." Erwin , 848 S.W.2d at 483. Because the verdict directing instruction lowered the State's burden in proving an essential element of the crime, plain error resulted.
The State cites State v. Wurtzberger , 40 S.W.3d 893 (Mo. banc 2001) for the proposition that the "assault" element was never disputed at trial, precluding a finding of plain error. The State argues that, while pleading not guilty may place each element "in dispute" for purposes of requiring the State to prove every element of the crime, it does not place every element "in dispute" for all contexts. Wurtzberger , however, involved accomplice liability. Defendant Wurtzberger was charged alternatively as a principal and an accessory to attempt to manufacture a controlled substance, methamphetamine. Id. at 895. He conceded that a woman was attempting to manufacture methamphetamine in his home; his defense was that he was not involved. Id. at 896, 898. The dispute at trial, therefore, was whether Wurtzberger purposefully acted together with or aided the woman in her attempt. Id. at 896. When Wurtzberger argued on appeal that the trial court plainly erred in failing to properly instruct the jury on the definition of "attempt," our Supreme Court found the definition of "attempt" had nothing to do with the disputed matters at trial. Id. at 898. Wurtzberger, therefore, was not prejudiced. Id. Unlike Wurtzberger , Rhymer challenges the definition of assault under circumstances where the type of assault the State was required to prove as an essential element of the crime of kidnapping was highly relevant to the disputed matters at trial.[12]
Rhymer's third point on appeal is granted.
Conclusion
We conclude that the circuit court did not err in finding sufficient evidence to sustain Rhymer's conviction pursuant to Section 565.110 on the kidnapping charge. The circuit court plainly erred, however, in failing to instruct the jury that Rhymer's intent in removing Corey from the Brookside Avenue residence was to commit felony assault. We reverse Rhymer's kidnapping conviction, and the associated armed criminal action conviction, and remand for a new trial on these counts. In all other respects, the trial court's judgment of conviction and sentence is affirmed.
All concur.

All statutory references are to the Revised Statutes of Missouri as supplemented through 2010, unless otherwise noted.

Rhymer initially submitted four points. He withdrew his fourth point (alleging error in sentencing) after our Supreme Court issued State v. Pierce , 548 S.W.3d 900 (Mo. banc 2018). Rhymer conceded an inability to prove that any misunderstanding by the court regarding the minimum sentence Rhymer could have received influenced the court's sentencing decision.

As there are two Cornejo brothers, they will be identified herein by their first names. As David Mendez shared the same last name with his mother, Ola Margaret Mendez, Mendez's mother will be referenced as Ola Margaret. No familiarity or disrespect is intended.

Mendez was referenced as "Cuko" by family and friends.

Rhymer does not contest the sufficiency of the evidence regarding Corey's forcible removal from the Brookside Avenue home.

The jury returned a guilty verdict of first-degree assault.

As we find the evidence sufficient to support that Rhymer intended felony assault at the time he removed Corey, we need not address the State's contention that, even if Rhymer had no plan to assault Corey or Mendez when he forcibly removed them from the residence, "if the purpose to commit the felony comes later, kidnapping has still occurred." We note, ex gratia , that the supporting cases cited by the State are inapposite in that they regard Section 565.110.1(2), the hostage taking portion of Section 565.110. These cases do not alter Section 565.110.1(4)'s statutory requirement that the unlawful purpose for the removal or confinement must precede or coincide with the removal or confinement.
The State also argues that the evidence is sufficient to support portions of Section 565.110 for which Rhymer was not charged. "When an act constituting a crime is specified in the charge ... the State is held to the proof of that act." State v. Palmer , 822 S.W.2d 536, 541 (Mo. App. 1992). The State's sufficiency arguments for uncharged acts are irrelevant.

A similar definition is found in Section 565.076.1(3), RSMo Cum. Supp. 2017, defining "domestic assault" in the fourth degree, a class A misdemeanor.

Section 565.110 (5) provides that kidnapping may also occur if the victim was removed for the purpose of "inflicting physical injury on or terrorizing the victim or another." "Terrorize is defined as 'to fill with terror or anxiety,' 'to coerce by threat or violence.' " Lynn v. State , 417 S.W.3d 789, 798 (Mo. App. 2013) (internal quotation marks and citations omitted)(overruled on other grounds). "Terror is defined as 'a state of intense fear.' " State v. Chambers , 884 S.W.2d 113, 116 (Mo. App. 1994) (internal quotation marks and citation omitted)(overruled on other grounds). Rhymer was not charged under this portion of the statute and, while placing someone in fear of harm might constitute "terrorizing the victim," the jury was not asked to decide this. "The State is held to proof of the elements of the offense it charged, not the one it might have charged." State v. Keeler , 856 S.W.2d 928, 931 (Mo. App. 1993).

While a reviewing court's limited determination on sufficiency review does not rest on how the jury was instructed and sufficiency review is based on how the crime was charged, this does " 'not suggest that an erroneous jury instruction cannot result in reversible error just because the evidence was sufficient to support a conviction." ' Zetina-Torres , 482 S.W.3d at 809 n.7 (quoting Musacchio v. United States , --- U.S. ----, 136 S.Ct. 709, 715 n.2, 193 L.Ed.2d 639 (2016) ).

Although it could be argued that Rhymer removed Corey with the intent of acting recklessly, and the recklessness resulted in serious physical injury or physical injury from discharge of a firearm, satisfying felony assault under Section 565.050 (3) and (4), intent to act recklessly requires a different mental state than intent to place someone in fear of harm. See § 562.016.4. The jury was only asked if Rhymer's intent was to place Corey in fear of harm.

See also State v. Busch , 920 S.W.2d 565, 569, where the court found instructional error in failing to include the element of deliberation in a first degree murder instruction, but finding no plain error because the "record is fraught with evidence Defendant deliberated on the murder of victim." As discussed above, the evidence regarding Rhymer's purpose in removing Corey from the home is not so overwhelming.