

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD81331 |
| | ) | |
| KEITH B. HUDSON, | ) | FILED: May 14, 2019 |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County
The Honorable Bryan E. Round, Judge**

**Before Division Four: Karen King Mitchell, C.J., and
Victor C. Howard and Alok Ahuja, JJ.**

Following a jury trial in the Circuit Court of Jackson County, Appellant Keith Hudson was convicted of robbery in the first degree and receiving stolen property. Hudson was sentenced to terms of imprisonment of fifteen years and seven years, respectively, with the sentences ordered to run concurrently. Hudson appeals. He asserts two Points, which challenge only his conviction for first-degree robbery. First, Hudson argues that the evidence was insufficient to support his conviction. Second, he argues that the circuit court plainly erred by submitting a verdict directing instruction which omitted a required definition.

We hold that the evidence was sufficient to support Hudson's robbery conviction. We conclude, however, that the circuit court plainly erred by failing to include the required definition of a "dangerous instrument" in the verdict director for the robbery charge, when that element was seriously disputed at Hudson's trial. We accordingly reverse Hudson's conviction for first-degree robbery, and remand

the case to the circuit court for further proceedings on the robbery charge. Because the instructional error relates to the element which differentiates first-degree from second-degree robbery, and because the evidence was otherwise sufficient to support Hudson's conviction, on remand the State will have the option of retrying Hudson for first-degree robbery, or agreeing to entry of a conviction for the lesser-included offense of second-degree robbery.

## Factual Background[1]

On November 1, 2016, sometime after 9:00 a.m., Officer Kenny Miller responded to a disturbance call at a McDonald's Restaurant on Broadway Street in Kansas City. An employee called the police because Hudson reportedly refused to leave the restaurant after complaining that a cup of coffee he had purchased was too cold. When Officer Miller arrived, Hudson was in the parking lot. Officer Miller spoke with Hudson, patted him down for weapons, and ran a computer check on Hudson's identification. Officer Miller let Hudson go after it was confirmed that he had no outstanding warrants.

A little before 10:00 a.m., the Victim, an adult female, pulled her Chevrolet Tahoe into a Shell gas station across the street from the McDonald's, to get a cup of coffee and gasoline. After pulling up to the pump, the Victim observed a man, whom she later identified as Hudson, standing near the gas station. While the Victim was sitting in her vehicle looking in her purse for money, Hudson approached and opened the driver's door of the vehicle. The Victim testified that Hudson put "something" to her side, which felt "like a sharp object"; she thought the object was a weapon. The Victim testified that she felt "real[ly] scared," and in fear for her life.

---

[1] "On appeal from a jury-tried case, we review the facts in the light most favorable to the jury's verdict." *State v. Rice*, 504 S.W.3d 198, 200 n.3 (Mo. App. W.D. 2016) (citation omitted). Because Hudson does not challenge his conviction for receiving stolen property, we omit the facts relevant only to that offense.

2

Hudson told the Victim to get out of the vehicle. The Victim complied. As she was exiting the vehicle, the Victim reached for her purse, but Hudson "told [her] to leave [her] purse and just get out." After the Victim got out, Hudson drove off in her vehicle. The Victim ran into the gas station, and someone called the police.

Officer Charles Hill responded to the call. The Victim described the robber as a black male, medium build with a lazy left eye, wearing blue jeans and dark clothing. Officer Hill notified a dispatcher of the Victim's description of the robber and of the stolen vehicle.

Less than five minutes after leaving the McDonald's, Officer Miller heard from dispatch that a robbery had occurred at the gas station across the street. The description of the robber matched Hudson, so Officer Miller reported the information he knew about Hudson to dispatch, and drove to the gas station.

Less than ten minutes after Officer Hill responded to the call at the gas station, Officer Kevin Eifert notified dispatch that he saw the Victim's vehicle less than two miles away, near 45th Street and Paseo Boulevard. The vehicle turned into the parking lot of a cellular phone store. Hudson exited the vehicle and walked into the store. After verifying that the vehicle belonged to the Victim, Officer Eifert arrested Hudson in the store. Hudson was searched, and officers found the keys to Brown's vehicle in his left coat pocket. Officers found no weapon on Hudson's person when they searched him incident to his arrest.

Officer Hill drove the Victim to the cell phone store where Hudson was detained. At the store, the Victim identified her vehicle, and identified Hudson as the person who had robbed her. Later that day, the Victim gave a statement to a detective, in which she stated that, although she could not be sure, she believed a gun was held to her side. At trial, the Victim testified that she had never met Hudson before he robbed her on November 1, 2016.

3

Hudson was charged with robbery in the first degree and receiving stolen property.

The case proceeded to a jury trial. In addition to admitting the evidence as outlined above, the State introduced into evidence a recording of surveillance video from the gas station where the robbery occurred. Because the surveillance video was shot from a distance, and because Hudson's interaction with the Victim occurred on the far side of her vehicle, the video does not reveal any details of their interaction, and in particular whether Hudson wielded any sort of object or weapon during the theft.

At trial, Hudson testified in his own defense. He testified that he first met the Victim the day before the robbery, on October 31, 2016, when she and a male companion asked him and a male associate if they wanted to buy jewelry and Fentanyl pills. Hudson was dealing methamphetamine at the time. He testified that he told the Victim that he did not want to buy the items, nor did he want to exchange drugs for the items. Instead, he offered the Victim drugs in exchange for letting him rent her vehicle or use her credit card. Hudson testified that the Victim did not agree to this exchange at that time.

Hudson testified that, the next day, he was at the Shell gas station when the Victim pulled in, and waved for Hudson to come over and talk to her. Hudson did not immediately walk over because he saw police nearby. After the police left the area, Hudson approached the Victim's vehicle. Hudson testified that, after he opened the vehicle's door, the Victim offered to let him rent her vehicle and use her credit card in exchange for 1.6 grams of methamphetamine. Hudson testified that he agreed to the transaction and gave the Victim the methamphetamine she requested. As the Victim got out of the vehicle, Hudson testified that he asked her if she wanted her purse; according to Hudson the Victim stated that there was

4

nothing of value in the purse, and walked away. After the Victim left, Hudson testified that he drove to the cell phone store where he was arrested.

Instruction No. 8 was the verdict director for robbery in the first degree. In relevant part, the instruction provided that, to convict Hudson for first-degree robbery, the jury was required to find that, "in the course of taking the property, the defendant displayed or threatened the use of what appeared to be a deadly weapon or dangerous instrument." Although Note on Use 3 to MAI-CR 3d 323.02 required that the term "dangerous instrument" be defined, Instruction No. 8 failed to do so. Hudson did not object to Instruction No. 8 prior to its submission to the jury.

The jury found Hudson guilty of robbery in the first degree and of receiving stolen property. The circuit court found Hudson to be a prior and persistent offender, and sentenced him to a fifteen-year term of imprisonment for the robbery offense, and to seven years for receiving stolen property, with the sentences ordered to run concurrently.

Hudson appeals.

## Discussion

### I.

We consider Hudson's two Points out of order. In his second Point, Hudson argues that there was insufficient evidence to convict him of robbery in the first degree.

To determine whether the evidence was sufficient to support a conviction, we do not assess the credibility of the evidence, but instead accept as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict. *State v. Naylor*, 510 S.W.3d 855, 858–59 (Mo. 2017).

> This is not an assessment of whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential

5

elements of the crime beyond a reasonable doubt. In reviewing the sufficiency of the evidence supporting a criminal conviction, an appellate court does not act as a "super juror" with veto powers but gives great deference to the trier of fact.

*Id.* at 859 (citations and internal quotation marks omitted).

Section 569.020.1[2] provides in relevant part that

A person commits the crime of robbery in the first degree when he forcibly steals property and in the course thereof he . . .

. . . .

(4)     Displays or threatens the use of what appears to be a deadly weapon or dangerous instrument.

Hudson argues that there was insufficient evidence of two of the elements of first-degree robbery under § 569.020.1(4). First, he argues that there was insufficient evidence that he forcibly stole property from the Victim. Second, Hudson argues that there was insufficient evidence that he threatened the use of what appeared to be a deadly weapon or dangerous instrument. We examine the evidence supporting each element in turn.

The evidence was sufficient to allow a reasonable fact-finder to find that Hudson forcibly stole the Victim's property. Section 570.030.1 defines "stealing" as the appropriation of property "of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion." A person "forcibly steals" "when, in the course of stealing . . . he . . . threatens the immediate use of physical force upon another person for the purpose of . . . [p]reventing . . . resistance to the taking of the property . . . ." § 569.010(1).

Hudson argues that there was insufficient evidence that he threatened to use physical force against the Victim. When determining the existence of a threat, courts apply an objective test that examines "whether a reasonable person would

---

[2]     Statutory citations refer to the 2000 edition of the Revised Statutes of Missouri, updated through the 2014 noncumulative supplement.

believe the defendant's conduct was a threat of the immediate use of physical force." *State v. Coleman*, 463 S.W.3d 353, 355 (Mo. 2015) (citation omitted). The threat of physical force "need not be explicit; it can be implied by words, physical behavior or both." *State v. Neal*, 36 S.W.3d 814, 816 (Mo. App. S.D. 2001) (citation omitted). Courts have found that a defendant impliedly threatened physical force by "display[ing] a weapon, engag[ing] in behavior that gave the appearance that he was armed, or us[ing] . . . phrases like, 'This is a holdup,' or that it is a 'stickup.'" *Patterson v. State*, 110 S.W.3d 896, 904 (Mo. App. W.D. 2003) (citation omitted); *see also State v. Cassel*, 419 S.W.3d 867, 869 (Mo. App. S.D. 2013) (citation omitted).

When viewing the evidence in the light most favorable to the State, there was sufficient evidence for a reasonable juror to find that Hudson's actions impliedly threatened the Victim with the immediate use of physical force, even though he never explicitly threatened her. Hudson opened the door to the Victim's car, and told her to get out of the vehicle. The jury could find that, as he did so, he pressed a sharp object to the Victim's side. From the Victim's perception of a sharp object, the jury could conclude either that Hudson was actually armed, or that he was intending to give the appearance of being armed. Further, Hudson ordered the Victim to leave her purse behind when she attempted to leave the vehicle with it. This evidence was sufficient to support a finding that Hudson stole the Victim's property forcibly. *See Coleman*, 463 S.W.3d at 355 (jury's finding of a threat of force was supported by evidence that the defendant "approached the bank teller [with] one hand concealed, . . . and directed the branch manager not to move any farther when she approached to investigate the situation"); *Patterson*, 110 S.W.3d at 905 (finding evidence sufficient to prove that the defendant "threatened the use of immediate physical harm upon the store employees by holding his right hand in his jacket pocket in a manner consistent with having a pistol and by otherwise acting

7

and speaking in a manner consistent with an armed holdup[,]" although defendant never actually claimed to have a weapon, and never explicitly threatened violence).

There was also sufficient evidence to support a jury finding that Hudson threatened the use of what appeared to be a deadly weapon or dangerous instrument. "The distinctive element of robbery in the first degree is the taking of the property of another by violence or by putting the victim in fear." *State v. Saucy*, 164 S.W.3d 523, 527 (Mo. App. S.D. 2005) (citation omitted). Section 569.020.1(4), under which Hudson was charged, "is concerned with the fear generated by that which may be neither a deadly weapon nor a dangerous instrument but which is utilized so as to give the appearance of being such." *State v. Sistrunk*, 414 S.W.3d 592, 598 n.3 (Mo. App. E.D. 2013) (citation and internal quotation marks omitted). Therefore, "the State does not have to show that the defendant actually possessed a dangerous instrument, only that there was evidence from which the fact finder could reasonably conclude that the victim believed the defendant was threatening its use." *State v. Bolthouse*, 362 S.W.3d 457, 460 (Mo. App. S.D. 2012) (citation and internal quotation marks omitted).

> Robbery in the first degree may be found where the victim is in fear even though there was no real possibility of injury. The fact that a victim perceives there to be a weapon that remains unseen is sufficient whether or not, in fact, such a weapon exists. Whether or not the object that is perceived as a deadly weapon or dangerous instrument is in fact capable of producing harm is unimportant. The threat to use the object to produce harm transmogrifies it into a dangerous instrument.

*Id.* (citation and internal quotation marks omitted). Evidence may be sufficient to establish the threatened use of what appears to be a deadly weapon or dangerous instrument "if the defendant . . . made motions indicating he had a concealed weapon during the course of the robbery . . . ." *Id.* (citations omitted).

In *State v. Simrin*, 384 S.W.3d 713 (Mo. App. S.D. 2012), the defendant robbed his victim by sticking an object through the victim's car window while the

8

victim was at an automated teller machine. *Id.* at 716. Evidence later recovered at the scene, and surveillance video, indicated that the object the defendant brandished was his cell phone. The Southern District nonetheless found sufficient evidence to support the defendant's conviction of first-degree robbery.

> [T]he fact that Simrin was not carrying a dangerous instrument is immaterial based on the facts of this case. Simrin approached [the victim's] vehicle and "stuck something through the window and said, 'Give me the money.'" [The Victim] testified he gave the cash to Simrin because he "couldn't tell at the time what [Simrin] had in his hand . . . if it was a gun, what kind of weapon it was, if anything[;]" he did not want to "take any chances with this guy" in that his "kids [were] in the car[;]" he would not have given the money to Simrin if he had not believed Simrin had a weapon; during the incident he was scared "[n]ot for himself, [but] for [his] children[;]" and he believed at the time Simrin had a gun or a taser. . . . The evidence is sufficient whereby a reasonable juror could have concluded [the Victim] believed Simrin was threatening to use a dangerous instrument, even though he did not see such an instrument and such an instrument ultimately did not exist.

384 S.W.3d at 719–20 (footnote omitted).

The evidence in this case is similar to that in *Simrin*. Here, the Victim testified that Hudson placed a sharp object against her side, and demanded her vehicle and purse. The Victim testified that she was scared and that she thought Hudson had a weapon, although she could not identify the kind of weapon Hudson had. The fact that the Victim complied with Hudson's demands to turn over her property is further evidence that she believed Hudson was threatening the use of a dangerous instrument. *Saucy*, 164 S.W.3d at 527 ("Compliance with the demands of the robber is indicative of the victim's fear of the consequences which could have resulted had he or she not complied." (citation omitted)).

Because the Victim did not visually confirm what Hudson was pressing against her side, Hudson argues the object could have been "a seat belt or the door itself." This argument ignores our standard of review: we view the evidence, and

9

all reasonable inferences from the evidence, in the light most favorable to the judgment – we do not view the evidence in a light *contrary* to the judgment. It was not necessary for the Victim to visually confirm the dangerous instrument's existence, or the nature of the dangerous instrument, nor did a dangerous instrument need to be found on Hudson's person when he was arrested.

There was sufficient evidence to support Hudson's conviction of robbery in the first degree. Point II is denied.

## II.

In his first Point, Hudson argues the trial court erroneously omitted the definition of a "dangerous instrument" from the verdict director for first-degree robbery. Hudson concedes that he did not object to the instruction on this basis, and that he is therefore entitled to review solely for plain error.

## A.

"For instructional error to rise to the level of plain error, [Hudson] must demonstrate that the trial court so misdirected or failed to instruct the jury as to cause manifest injustice or miscarriage of justice." *State v. Cooper*, 215 S.W.3d 123, 125 (Mo. 2007) (citation omitted).

Failing to require the jury to find every fact essential to conviction may constitute plain error. "'A verdict-directing instruction must contain each element of the offense charged and must require the jury to find every fact necessary to constitute essential elements of [the] offense charged.'" *Id.* (quoting *State v. Doolittle*, 896 S.W.2d 27, 30 (Mo. 1995)). "A violation of due process arises when an instruction relieves the State of its burden of proving each and every element of the crime and allows the State to obtain a conviction without the jury deliberating on and determining any contested elements of that crime." *Cooper*, 215 S.W.3d at 126 (citation omitted). Because it is fundamental that the State must be required to prove, and the jury must be required to find, each element of an offense, it is well-

10

established that "'[p]lain error exists when an instruction omits an essential element and the evidence establishing the omitted element was seriously disputed.'" *State v. Zetina-Torres*, 482 S.W.3d 801, 811 (Mo. 2016) (quoting *State v. Stover*, 388 S.W.3d 138, 154 (Mo. 2012)); *see also, e.g.*, *State v. Rhymer*, 563 S.W.3d 714, 722 (Mo. App. W.D. 2018); *State v. Henderson*, 551 S.W.3d 593, 600 (Mo. App. W.D. 2018).

The elements of first degree robbery were submitted to the jury in Instruction No. 8, which was based on MAI-CR 3d 323.02 (now MAI-CR 4th 424.00). The relevant portion of Instruction No. 8 provided that, to convict Hudson, the jury must find that "in the course of taking the property, [Hudson] displayed or threatened the use of what appeared to be a deadly weapon or dangerous instrument." Instruction No. 8 did not, however, define the term "dangerous instrument." This violated Note on Use 3 to MAI-CR 323.02, which states that when the term "dangerous instrument" is used in the instruction, "the paragraph defining that term must be used." The omitted definition would have advised the jury that a "dangerous instrument" is "any instrument, article or substance which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury." The State concedes that it was error to omit this definition of "dangerous instrument" from Instruction No. 8.

"[T]he absence of a required definition from a verdict-directing instruction has the potential of effectively omitting an essential element of the offense." *State v. Jones*, 519 S.W.3d 818, 826 (Mo. App. E.D. 2017) (citing *State v. Arnold*, 397 S.W.3d 521, 529 (Mo. App. S.D. 2013)). "In determining whether the jury instruction misdirected the jury, an appellate court will be more inclined to reverse judgments where the erroneous instruction did not merely allow a wrong word or some other ambiguity to exist, but excused the State from its burden of proof on a contested element of the crime." *Jones*, 519 S.W.3d at 826 (citation and internal

11

quotation marks omitted). Here, the omission of the definition of a "dangerous instrument" from Instruction No. 8 excused the State from having to prove, and the jury from having to find, that Hudson threatened the use of an instrument which appeared to be "readily capable of causing death or other serious physical injury."

Whether or not Hudson threatened the use of a dangerous instrument was seriously disputed at trial. First, in his testimony Hudson disputed that any robbery occurred—instead, according to him, his use of the Victim's vehicle was part of a consensual drug deal. The fact that Hudson claimed his use of the Victim's vehicle was consensual puts in dispute the State's claim that he used a dangerous instrument to misappropriate the vehicle. *See State v. Neal*, 328 S.W.3d 374, 383 (Mo. App. W.D. 2010) (finding plain error where verdict director for first-degree robbery omitted "dangerous instrument" element, and the defendant's "defense was that [the victim] consented to the entirety of events of that night"); *State v. Roe*, 6 S.W.3d 411, 415–16 (Mo. App. E.D. 1999) (finding plain error where instruction did not require jury to find intent to kill to support first-degree murder conviction, where defendant denied any involvement in the murder; "although Defendant may not have actively contested the intent element, as it would have been inconsistent with his theory at trial, we cannot say that the element of intent in this case was in no meaningful sense a contested element, because Defendant never conceded that whoever shot [the victim] had the intent to kill him.").

Beyond denying that any stealing occurred, at trial Hudson also specifically contested the Victim's testimony that he had wielded an object, and concerning the nature of any object. During cross-examination of the Victim, Hudson's counsel emphasized that she never actually _saw_ the object Hudson purportedly wielded, but instead merely "felt some kind of an object in [her] side." Counsel also emphasized that the Victim never actually saw any object *in Hudson's hand*, and that Hudson

12

never expressly threatened to hurt her, and never said he had a weapon or identified what that weapon was. Counsel continued:

> Q. And you are telling us that he had something in his hand and that is because you felt something in your side, is that right?
>
> A. Yes.
>
> Q. But you weren't even turning and facing him at the time that this took place?
>
> A. No.
>
> Q. So it's kind of an assumption that he had something in his hand, is that right?
>
> A. Well, I felt something in my side.
>
> Q. You felt something to your side?
>
> A. Um-hum.
>
> Q. Okay. And so you assume that that something was in Mr. Hudson's hand?
>
> A. Yes.
>
> Q. Even though you weren't even turning to look at him to see whether he was holding something against you or not, is that fair?
>
> A. Yes.

Later, the Victim agreed with counsel's statement that "you don't really know what he is doing over there, you just feel something in your side." Counsel also questioned the Victim about testimony that the police dispatcher had told officers that the assailant had held a gun to the Victim's head; counsel suggested that Victim had been inconsistent as to whether Hudson had held a gun to her head, or instead had held "something" that felt "like a sharp object" to her side.

The dispute as to whether Hudson was holding *anything*, and if so, what it was, continued during the parties' closing arguments. In its closing, the State argued that Hudson "made sure [the Victim] thought he had *a gun or a knife or something that was going to hurt her*." The State also conceded that the Victim

13

"didn't know if he had a weapon for sure or not," but that the actual existence of a weapon was unnecessary, if Hudson made it *appear* that he was armed.

During the defense closing, counsel emphasized the supposed vagaries and inconsistencies in the Victim's account as to *whether* Hudson had wielded an object, and the nature of the object he had used. Thus, counsel argued:

> Mr. Hudson opened the door and she feels something poking in her side. She does not turn to look at Mr. Hudson. She specifically said that. She does not turn to look at him. She does not know whether he was holding anything in his hand. These are not my words. These are [the Victim's] words. She does not know whether he actually had anything in his hand. She doesn't even know whether he was actually pushing something against her side. She didn't see it. She felt something. And from that, she concludes it may have been a gun. It may have been a weapon. And hey, to be honest with you, if you feel that, it may be a lot of things. That is true. It may be all kind of things. But does that appear to be a deadly weapon or dangerous instrument? She didn't see anything. There is no possible way on this Earth that they have met their burden, based on what [the Victim] says. Something you don't see does not have an appearance of anything.

As in his cross-examination of the Victim, counsel also argued that the Victim had been inconsistent, reporting that a gun had been held to her head during the 9-1-1 call, but later claiming that a sharp object had been held to her side.

Defense counsel also emphasized during closing argument that Hudson was searched by police both shortly before the theft (when Officer Miller patted him down at the McDonald's restaurant), and shortly afterwards, when he was arrested. Counsel emphasized that the officers on each occasion found "[n]othing. No weapon. . . . Nothing that could have even been used as a weapon[,] . . . nothing hard, nothing pointy, nothing."

Given this testimony and argument, it is evident that the existence and nature of any object Hudson wielded was seriously disputed. The jury's deliberations would undoubtedly have been influenced by an instruction telling

14

them not only that they needed to find that Hudson had threatened the use of what appeared to be a "dangerous instrument," but that they had to find that the instrument appeared to be "readily capable of causing death or other serious physical injury." The circuit court plainly erred by omitting the required definition of a "dangerous instrument" from the verdict director for first-degree robbery in this case. *See*, *e.g.*, *State v. Doolittle*, 896 S.W.2d 27, 29–30 (Mo. 1995) (finding plain error and reversing first-degree robbery conviction where instruction failed to define "dangerous instrument" or to require jury to find that defendant employed a dangerous instrument; at trial, the defendant disputed that he wielded a Coke bottle in theft from convenience store, or that he used it as a dangerous instrument); *State v. Arnold*, 397 S.W.3d 521, 529 (Mo. App. S.D. 2013) (prosecution for offense of trafficking in stolen identities, which required a finding that the defendant intended to transfer means of identification "for the purpose of committing identity theft"; finding plain error where verdict director omitted required definition of "identity theft," and "defense counsel consistently argued that: (1) Defendant did not know the means of identification were in the car [in which the Defendant was a passenger]; and (2) said items belonged to the driver, who ran away . . ." and was never apprehended).[3]

---

[3] This case is distinguishable from *State v. Jones*, 519 S.W.3d 818 (Mo. App. E.D. 2017), on which the State relies. In *Jones*, the State charged Jones with attempting to cause physical injury with a dangerous instrument—his vehicle. 519 S.W.3d at 821. The State contended that, in the underlying incident, Jones attempted to evade a bail bondsman by using his vehicle to strike the bail bondsman's vehicle and push it into a pole. *Id.* Jones contended that his vehicle accidentally struck the bail bondsman's, because the bail bondsman "was speeding, driving recklessly, and swerving into the other lane." *Id.* at 822. As here, the verdict director omitted the required definition of a "dangerous instrument." *Id.* The Eastern District rejected Jones' claim that this constituted plain error. *Id.* at 827. But in *Jones*, the defendant admitted that he wielded the object in question (his vehicle), and did not dispute that the object in question could constitute a "dangerous instrument." Instead, the defendant in *Jones* argued that he did not intentionally wield the object at all. As we have explained in the text, this case is fundamentally different: here, Hudson contested both that he wielded an object, and that this object constituted a "dangerous instrument."

**B.**

Having found that the circuit court plainly erred in failing to provide the jury with the MAI-required definition of a "dangerous instrument," we must now address the appropriate remedy.

"The general rule is that the remedy for instructional error is to remand the case for a new trial." *State v. Neal*, 328 S.W.3d 374, 383 (Mo. App. W.D. 2010) (citation omitted). This case is unusual, however. As we explained in § I, above, the evidence at trial was sufficient to establish Hudson's guilt of first-degree robbery. Moreover, the instructional error in this case relates only to a single element of first-degree robbery: whether Hudson "[d]isplay[ed] or threaten[ed] the use of what appears to be a deadly weapon or dangerous instrument." § 569.020.1(4). The instructional error did *not* affect the jury's finding that the *other* elements of first-degree robbery had been established beyond a reasonable doubt: that Hudson took a Chevrolet Tahoe belonging to the Victim; that Hudson did so for the purpose of withholding it permanently from the Victim; and that Hudson threatened the immediate use of physical force against the Victim for the purpose of preventing her resistance to Hudson's taking of the vehicle. These "untainted" elements constitute the lesser offense of second-degree robbery. *See* § 569.030. The jury was instructed on this lesser-included offense. In addition, Hudson was not entitled to jury sentencing in this case, because the circuit court found him to be a prior and persistent offender.

In these circumstances, when (1) an instructional error relates only to an element which differentiates a greater offense from a lesser-included offense; (2) the lesser offense was actually litigated; (3) there was otherwise sufficient evidence to support the jury's conviction of the greater offense; and (4) jury sentencing is not available, we believe the appropriate remedy is to give the State the option of retrying the defendant for the greater offense, or instead agreeing to the entry of a

16

conviction of the lesser offense, without the necessity of a retrial.  The Eastern District reached this conclusion in *State v. Roe*, 6 S.W.3d 411 (Mo. App. E.D. 1999), in circumstances which are functionally identical to the situation here.  The Court cogently explained why, in these circumstances, the interests of judicial economy, and of fairness to the parties, justified giving the State the option whether to retry the defendant for the greater offense:

> It is fundamental that the appellate remedy should extend no further than the scope of the wrong.  The wrong here is that the trial court misdirected the jury as to the proper essential elements of first-degree murder and armed criminal action[, by failing to correctly instruct on the state of mind required to support a first-degree murder conviction].  However, the erroneous instruction clearly contained all the requisite elements of second-degree murder and armed criminal action, albeit with some language from the first-degree murder instruction that could be deemed surplusage.  Further, both second-degree murder and armed criminal action were, in fact, submitted as lesser-included offenses.  Thus, Defendant had full notice and a complete opportunity to defend against the charges of second-degree murder and armed criminal action.  Despite a vigorous defense, the jury still found, unanimously and beyond a reasonable doubt, that Defendant committed all the constituent elements of second-degree murder and armed criminal action.  Finally, the court found Defendant to be a prior offender, a classification that makes the assessment of punishment a question for the judge rather than the jury, thus foreclosing any expectation of Defendant that the jury would assess his sentence.  Given these circumstances, remand for a new trial is an appellate remedy that exceeds the scope of the wrong, representing a windfall to Defendant who failed to timely raise his claim of error.  Under the circumstances, the appropriate disposition of this case is . . . [one] in which the State is allowed on remand to choose whether to retry the defendant or accept the lesser convictions.

*Id.* at 417 (footnotes omitted).  The Court noted that, because the procedural error did <u>not</u> affect the jury's finding of the essential elements of second-degree murder and armed criminal action, "Defendant received a perfectly fair trial as to second-degree murder and armed criminal action[,]" and therefore giving the State the choice to have a conviction entered for the lesser offenses without a retrial "does not violate Defendant's constitutional right to a fair trial."  *Id.* at 418.  The Eastern

17

District followed *Roe*, and entered the same dispositional order, in *State v. Bell*, 488 S.W.3d 228, 247–49 (Mo. App. E.D. 2016).[4]

We believe *Roe* is persuasive, and that the remedy it affords furthers the interests of judicial economy, and is fair to the parties. On remand, the State will have the opportunity to elect whether to retry Hudson for first-degree robbery, or instead accept the entry of a conviction for second-degree robbery.

### Conclusion

Hudson's conviction for first-degree robbery is reversed, and the case is remanded to the circuit court for further proceedings with respect only to the robbery charge. On remand, Hudson will be entitled to a new trial unless the State elects, within sixty days from the issuance of our mandate, to accept the entry of a conviction for the lesser-included offense of second-degree robbery. If the State elects the entry of a conviction of the lesser offense, Hudson shall be resentenced accordingly.

Alok Ahuja, Judge

All concur.

---

[4]     In *State v. Neal*, 328 S.W.3d 374 (Mo. App. W.D. 2010), we took the *Roe* principle a step further. *Neal* was a prosecution for rape and first-degree robbery. On the robbery count, the verdict director proffered by the State wholly omitted the "dangerous instrument" element; thus, although the defendant had been charged with *first-degree* robbery, the tendered instruction correctly set forth the elements of *second-degree* robbery. Neal did not object to the instruction. In these circumstances, we held that "[b]oth parties consented to the submission of the lesser included offense of robbery in the second degree[,]" instead of first-degree robbery. *Id.* at 385. Given that the parties had essentially consented to try the case solely on a second-degree robbery charge, we held that "[n]either judicial economy nor the rights of the parties would be served by granting either party a new trial" on first-degree robbery. *Id.* We therefore ordered the entry of a conviction for second-degree robbery. In this case, by contrast, the State plainly sought to submit the offense of first-degree robbery to the jury, and the approach taken in *Neal* is inapplicable.

18